# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK ANTHONY ALVAREZ, ) | 1:03-CV-5556 AWI LJO HC |
| ) | |
| Petitioner, ) | FINDINGS AND RECOMMENDATION |
| ) | REGARDING PETITION FOR WRIT OF |
| v. ) | HABEAS CORPUS |
| ) | |
| GEORGE M. GALAZA, Warden, ) | [Doc. #1] |
| ) | |
| Respondent. ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Due to the death of Magistrate Judge Hollis G. Best and the appointment of Magistrate Judge William M. Wunderlich, by order dated May 2, 2004, this case was reassigned to the undersigned for all further proceedings.

**PROCEDURAL BACKGROUND**[1]

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on July 9, 1999, as an aider and abettor of one count of first degree murder with drive-by special circumstances (Cal. Penal Code §§ 187/190.2(a)(21)), and two counts of attempted first degree murder (Cal. Penal Code §§ 664/187). See Exhibit 1, Respondent's Answer to the Petition (hereinafter "Answer"). The jury further found that Petitioner was armed during the commission of all three offenses (Cal. Penal Code § 12022(a)(1)) and that the two attempted murders were willful, deliberate and premeditated (Cal. Penal Code § 664(a)). See Exhibit 3, Answer. In a bifurcated proceeding, the trial court found true the allegations that Petitioner had suffered a prior serious

---

[1] This information is derived from the petition for writ of habeas corpus and Respondent's answer to the petition.

felony conviction within the meaning of California's Three Strikes law and a sentence enhancement. Id. In addition, the trial court found true an enhancement for a prior prison term within the meaning of Cal. Penal Code § 667.5(b). Id. As a result, Petitioner was sentenced to serve, consecutively, a six-year determinate term, a life term without the possibility of parole, and four life terms with the possibility of parole. Id.

Thereafter, Petitioner filed a notice of appeal with the California Court of Appeal, Fifth Appellate District (hereinafter "5th DCA"). On February 8, 2002, the 5th DCA issued an unpublished opinion affirming the judgment. Id.

Petitioner filed a petition for review in the California Supreme Court on March 18, 2002. See Exhibit 4, Answer. On May 1, 2002, the petition was summarily denied. See Exhibit 5, Answer.

On May 5, 2003, Petitioner filed the instant federal habeas petition in this Court. Petitioner raises two grounds for relief: 1) Petitioner claims the trial court erred in denying defense counsel's motion under People v. Wheeler, 22 Cal.3d 258 (1978); and 2) Petitioner claims the doctrine of natural and probable consequences cannot be used to supply the missing element of intent for first-degree murder and the drive-by special circumstance.

On September 17, 2003, Respondent filed an answer to the petition.

On February 19, 2004, Petitioner filed a traverse.

## FACTUAL BACKGROUND

The Court hereby adopts the facts as summarized by the 5th DCA in its opinion dated February 6, 2002:

> Shortly before midnight on May 24, 1997, Matthew Vargas got into a fight with three young men outside a liquor store in Fresno. They beat him up and stole his beer. The details of the fight beyond that are not important for purposes of our review.
>
> Vargas walked home and called his friend Mark Alvarez, the defendant in this case. He told Alvarez what had happened, and asked him to come over right away. He also asked Alvarez to bring the gun he (Alvarez) was keeping at his house for Vargas. It was a semi-automatic .22-caliber rifle with a sawed-off stock. It had a tubular magazine beneath the barrel capable of holding 14 bullets, and a spring-loaded knob on the side that cocked the gun when pulled all the way back. The rifle was loaded when Alvarez left the house.
>
> Alvarez put the rifle on the floor of the car just behind the front seats. This was a departure from his usual practice of carrying it in the trunk. Alvarez picked up Vargas at his house, and the two of them then drove around the neighborhood for about 20 minutes looking for Vargas's three assailants. They could not find them and so returned to Vargas's house, where they remained for the next two hours drinking beer and smoking marijuana.

> At about 2:30 in the morning, Alvarez and Vargas drove to the home of another of Vargas's friends, Raul Montellano. Alvarez waited in the car while Vargas went around to the back of the house and awoke Montellano by knocking on his bedroom window. He asked Montellano to go with him and Alvarez to find the three guys who had jumped him. Montellano refused and went back to sleep. He would later testify Vargas was still very mad about the incident when he saw him that night, and intoxicated to the point his speech was slurred and his walk unsteady.
>
> Alvarez and Vargas again drove around the neighborhood looking for Vargas's three assailants.
>
> It was not long before they found them. Since beating up Vargas and drinking his beer the three young men had continued to wander the streets causing trouble. They had, among other things, assaulted another person and broken into a parked car. They were walking three abreast down the center of the street when one noticed a car behind them with its headlights off, driving slowly in the opposite direction. The car drove out of sight, but reappeared a few minutes later at a stop sign in front of them. It was stopped there, with its headlights on. Then the car started driving slowly toward them and switched on its high beams. When it reached the three men, the passenger, Vargas, leaned out the window and opened fire. He continued to shoot as the three men fled. The car stopped briefly as Vargas fired one more shot, making 10 shots altogether, and then drove off.
>
> One of the three men – the one who had picked the fight earlier with Vargas – was shot three times and killed by a bullet that passed through his heart. The other two were wounded, one seriously.
>
> Vargas was arrested shortly after the shooting. He was tried and convicted of murder and attempted murder in March of 1998. Alvarez remained free until his arrest in September of 1998. The details of the investigation that led to his arrest are not pertinent here because, as we will explain below, Alvarez subsequently acknowledged that he was the person driving the car when the shooting occurred.
>
> Prior to Alvarez's arrest, Lisa Marquez, his girlfriend at the time of the shootings, told police Alvarez had been at home with her all that night. After his arrest, she said this was not true, and that Alvarez had in fact confessed to her his part in the shooting. One day soon afterward, she received several phone calls from Alvarez in jail in which he allegedly threatened to kill her. The threats were the basis for the charge against Alvarez of attempting to dissuade a witness, and were the context in which the trial court later admitted evidence Alvarez had committed various acts of violence in the past against Marquez and others . . . .
>
> **Defense**
>
> Alvarez testified at trial in his own defense. He acknowledged the shootings had occurred in much the manner described above, although with certain variations tending to show he was not aware Vargas would shoot the victims and so did not intend to aid and abet a drive-by shooting. He testified, for example, that Vargas said he only wanted to fight his three assailants "one-on-one"; that he and Vargas saw the three men just once that night and only then by chance on their way back to Vargas's house from Montellano's; that he forgot all about the gun behind the seats; that he switched on his high beams simply so the three men would move out of the way; that he was "completely surprised" when Vargas started shooting; that he tried to restrain Vargas; and that he did not stop the car at the scene.

See pp. 3-5, Exhibit 3, Answer.

**DISCUSSION**

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II. Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

1  As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, quoting 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., quoting Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, quoting 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state

court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petitioner's Claims**

**A.  Ground One**

In his first ground for relief, Petitioner claims the trial court erroneously denied defense counsel's motions under People v. Wheeler, 22 Cal.3d 258 (1978). Petitioner, a Hispanic-American, contends the prosecutor used peremptory challenges to systematically exclude the only two African-American jurors on the jury panel in violation of his constitutional rights. He argues the trial court erred in failing to recognize that a prima facie case of discrimination had been established.

1.  Factual Background[2]

Jury selection began in this case with an examination of the entire panel for hardship. Several of the potential jurors were excused. Twelve people were then called into the jury box and examined for cause. Several more jurors were excused on this basis. The remaining twelve were then examined by the court and counsel for purposes of exercising peremptory challenges. Juror W. occupied seat number 1. When it came time for the prosecutor to exercise the first peremptory challenge, the prosecutor passed. The defense excused Juror 11, whose replacement was excused for cause and then replaced in turn by Juror T. Jurors W. and T. are the two potential jurors at issue in this case.

The prosecutor exercised her first peremptory challenge to excuse Juror W., whereupon defense counsel requested a sidebar conference to register his objection. At a subsequent break in the proceedings, outside of the presence of the jury, defense counsel made his first Wheeler motion. Counsel objected that Juror W. was only one of two or three African-Americans left in the venire, so her excusal made it all the more likely there would be no African-Americans on the jury once it was finally accepted. Defense counsel also argued that Juror W., by all appearances, seemed very qualified to sit on the jury. The court ruled that the defense had failed to make a *prima facie* case of discrimination and denied the motion.

---

[2]These facts are derived from the factual summary in the opinion of the 5th DCA. See pp. 8-9, Exhibit 3, Answer.

U.S. District Court
E. D. California           cd                                    6

Juror T. occupied seat number 11 in the jury box. At the conclusion of the court session during which he was seated, and outside the presence of the other prospective jurors, the woman occupying seat number 10 complained to the court that Juror T. had made unwelcome advances toward her. As a result, she said she was uncomfortable sitting next to him and would be unable to pay attention to the trial if he were on the jury. The court then excused Juror No. 10 for cause.

Sometime before court resumed the next day, the prosecutor learned Juror T. had once been convicted of a crime, a fact he had failed to disclose during voir dire. During a break in jury selection and again outside the presence of the other jurors, the court asked Juror T. about his omission. Juror T. explained he had forgotten about the conviction until sometime after he was questioned, but he intended to bring it to the court's attention. He said he had pleaded guilty to misdemeanor assault some eight or nine years earlier and been granted probation. He had then failed to report to his probation officer and so was jailed for 30 days.

Later that same morning, the prosecutor exercised her seventh peremptory challenge to excuse Juror T. During a subsequent break in jury selection, outside the presence of the other jurors, the defense made a second Wheeler motion. Defense counsel brought the motion on the ground that Juror T.'s excusal left no African-Americans in the venire. The court again ruled the defense had failed to establish a *prima facie* case for discrimination, and denied the motion. The court stated it felt Juror T. had been deceptive, or at least confused, in attempting to explain his failure to report his prior conviction, and in describing the circumstances of the conviction and probation violation.

2.  Clearly Established Supreme Court Law

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard established by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986).

In Batson, the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause. Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769 (1995).  First, the defendant must make a *prima facie* showing that the prosecutor has exercised a peremptory challenge on the basis of race. Id. That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference"

that the prosecution has excluded venire members from the petit jury on account of their race. Id.

If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge. Id. At this step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859 (1991). Finally, the trial court must determine if the defendant has proven purposeful discrimination.

### 3. Review of Claim by State Courts

This claim was first presented on direct appeal to the 5th DCA. The 5th DCA denied the claim on February 6, 2002, in a reasoned opinion. See Exhibit 3, Answer. The claim was then presented to the California Supreme Court in a petition for review; however, the petition was summarily denied on May 1, 2002. See Exhibit 5, Answer. The California Supreme Court, by its "silent order" denying review of the 5th DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the 5th DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In reviewing Petitioner's claim, the 5th DCA found the trial court's rulings to be amply supported by the evidence. With respect to Juror W., the appellate court found that defense counsel had failed to make out a *prima facie* case of discrimination. The appellate court considered the entire record of voir dire and found the prosecution had adequate race-neutral reasons for challenging Juror W. Defense counsel did not set out any relevant circumstances such as the prospective juror's individual characteristics, the nature of the prosecutor's voir dire, or the prospective juror's answers to questions. In addition, the court found it significant that Juror W. had expressed a desire to serve on the jury. The court stated that this eagerness might have been seen to betray too great an interest in the sensational nature of the crimes, at the expense of her ability to attend to the more mundane details. The court also noted the prosecutor may have excused Juror W. because of her young age in that Juror W. lacked the life experiences necessary to handle a murder trial. With respect to Juror T., the court found his lack of candor alone was sufficient reason to excuse him from the jury.

### 4. Analysis

The state court's denial of Petitioner's claim is consistent with Supreme Court precedent.

1  According to Batson, defense counsel must first demonstrate that the facts and circumstances of the
2  case raise an inference that the prosecution excluded the jurors on account of their race. 476 U.S. at
3  89. This, defense counsel entirely failed to do. The only point defense counsel raised was that the
4  two jurors in question were of a particular race. As found by the trial court and affirmed by the
5  appellate court, defense counsel's assertion that the prosecution was systematically excluding
6  African-American jurors was unfounded. Defense counsel did not point to any facts or circumstances
7  such as the prospective juror's individual characteristics, the nature of the prosecutor's voir dire, or
8  the prospective juror's answers to questions, which would give rise to an inference of discrimination.
9  Merely stating that an excused juror belongs to a particular ethnicity does not raise an inference of
10 discriminatory purpose. Furthermore, at the time Juror W. was excused, she was not the only
11 prospective African-American juror in the venire at the time; the trial court noted two others who
12 were seated in the courtroom. (RT[3] 403.)

13      In addition, the appellate court noted several adequate race-neutral explanations for the
14 excusal of the two potential jurors. When the prosecution asked the potential jurors whether anyone
15 had any relatives or friends employed by the District Attorney's office, Juror W responded that her
16 aunt was employed in the juvenile department. (ART[4] 83.) Juror W. stated she only communicated
17 with her aunt via mail since her aunt had become employed at the District Attorney's office. (ART
18 83.) Juror W. also stated that her husband was employed at a group home as a group counselor for
19 juvenile delinquents. (ART 112.) Later, when defense counsel was given the opportunity to question
20 the prospective jurors, counsel asked whether there was "anybody that would like to be a juror in this
21 case." (ART 130.) Juror W. responded that she wanted to be a juror, stating specifically:

22      Um, first, coming yesterday, I did not want to be a juror. Earlier this morning, I was
        kind of turned between sides, but this is my first experience, and crime happens every day,
23      and I would like to just to be here to – to be the best juror as possible. I would like – just like
        to – I'm curious to know what is going on, what I can do to help. I'm curious. I'm to the
24      point where I'm curious now . . . I think it will be a very interesting case.

25 (ART 131.)

26
    ─────────────
27      [3]"RT" refers to the Reporter's Transcript lodged with the Court.

28      [4]"ART" refers to the Augmented Reporter's Transcript lodged with the Court.

Based on her testimony, it is reasonable to conclude the prosecution excused Juror W. because of her ties to the District Attorney's office or because of her husband's employment. The prosecution may have also excused Juror W. because of her demonstrated interest in the sensational nature of the crime. In addition, Juror W. may have been excused because she was only 23 years old. (ART 112.) But whatever reason the prosecutor had for dismissing Juror W., there is no evidence of a discriminatory motive.

Juror T. did not have any friends or relatives in law enforcement; however, he did have several family members who had been incarcerated and some who were still in custody. (ART 203.) In addition, when defense counsel asked Juror T. "if [he] had a close relative, somebody [he] really cared about, sitting there in [defendant's] shoes, and he was thinking about whether [he] should be on the jury, should [the defendant] have anything to worry about," Juror T. replied, "None whatsoever." (ART 200.) Defense counsel followed up on the question by asking, "Of course, he was – you would be sympathetic?" To which, Juror T. replied, "Right." (ART 200.)

Juror T. also failed to admit in his juror questionnaire a prior conviction for assault which had been reduced from a felony to a misdemeanor. (RT 408-09.) The following colloquy took place outside of the presence of the other jurors:

> THE COURT: All members of the panel are now outside the courtroom, with the exception of [Juror T.]. The only other persons in the courtroom, at this time, are the defendant, his attorney, the district attorney, and the court staff.
>
> Mr. [Juror T.], this morning I was provided with some information that suggest that perhaps in the past you've either been arrested or suffered some conviction for a crime or crimes. Is there anything like this in your history, sir, that you didn't let us know?
>
> PROSPECTIVE JUROR NO. 11: Yes there is. I apologize. I put it out of my mind. When I – when I was 18, um, I had the occasion to get into a – a tussle, or a fight, with a young man who was under 18, at the time. He was harassing my younger sister, using some pretty nasty language, and threatening to hit her with a pipe. When she brought it to my attention, I confronted the young man. He had a pipe. He swung at me. I hit him. We got into a fight. He apparently brought me to court, and we took care of it in that manner. That is what happened.

(RT 408-09.)

Juror T. stated that he pleaded guilty to a misdemeanor assault and was placed on probation. (RT 410.) He then explained how he had violated his probation:

> PROSPECTIVE JUROR NO. 11: I was placed on – placed on probation. I failed to meet my probation agreements. I forgot – I was working and going to school, and I forgot to meet with

my probation officer for two months, so then I had to go and serve time for – for not going and taking care of that, like I should.

THE COURT: You were found to be a violation [sic] of probation?

PROSPECTIVE JUROR NO. 11: Yes, correct.

THE COURT: How much time did you have to serve?

PROSPECTIVE JUROR NO. 11: 30 days, I believe.

THE COURT: Okay. Okay. Anything else, sir? Is that it?

PROSPECTIVE JUROR NO. 11: That's it. Yeah, I had completely forgotten about that, because, you know, I screwed up, so I put it out of my mind.

(RT 410.)

The prosecutor inquired further into Juror T.'s probation terms, and Juror T. stated that he was to report to his probation officer "once a month" but "had missed a couple of times." (RT 411.) The court then inquired further into the missed probation meetings, to which Juror T. replied that he had missed "two to three months' worth." (RT 413.) Juror T. admitted that he had met with the probation officer immediately after being placed on probation. (RT 413.) When asked when he became aware of missing the meetings, Juror T. stated:

> Well, I didn't completely understand the terms. I thought – I was under the impression that I had to meet him and that was it, that I go and met [sic] my probation officer. Now, I have a probation officer. I was very ignorant to what I had to do. After the case, my attorney kind of stepped aside, and , so, I didn't – I didn't follow it, I didn't read the paperwork correctly, and I didn't understand what was really going on.

(RT 413.)

The court followed up further by asking how Juror T. finally was arrested for the probation violation. Juror T. responded:

> PROSPECTIVE JUROR NO. 11: I'm trying to remember how that happened. I missed - I was going to my class or my - my community service, and I believe that they asked me to come into the office and - because - because they needed to speak with me concerning that - that I had missed some probation, so when I went in they said, well, you've missed this and that. You need to go - now you need to go back to court because the fact that you missed it.
>
> THE COURT: Okay. I thought earlier that you stated that - that you had just forgotten to attend, so that told me you actually knew you were to go meet with your probation officer. Did you forget, or did you understand that you were to meet with your probation officer more than one time?
>
> PROSPECTIVE JUROR NO. 11: Well, I remember that I had to go the first time. After that, I - I believe that I didn't - didn't have to go, and if I did remember that I had to go, I forgot. I

1   don't recall specifically right now. It's been eight years, so I don't exactly recall.

2   (RT 415.)

3   After the prosecution peremptorily challenged Juror T., defense counsel renewed his Wheeler
4   motion. The trial court dismissed the motion for failure to make a *prima facie* case. Specifically, the
5   trial court stated:

> I don't think the *prima facie* case has been set forth regarding excuse of [Juror T.]. The district attorney, when we first met this morning – as a matter of fact, you two came into chambers and let me know that she had information to lead her to believe that [Juror T.] had suffered a criminal conviction in the past.
> During the recess, I think just before noon, I inquired of [Juror T.] whether or not he had ever suffered a conviction. The answer was, yes, he had. He had forgotten about it but recalled it when one of the other prospective jurors was questioned about that issue; that he was going to bring it up, for some reason, this afternoon. When he was asked what – what the conviction was, he, you know, kind of remembered what it was, but kind of soft-pedaled it. He was placed on probation, then he said that he was violated because, as I recall, that he forgot to meet with his probation officer; that he was going to school and working, and he just didn't remember it, and I – so, he didn't meet with his probation officer.
> Later on, in the questioning, he gave a different version, that he thought he only had to meet with a probation officer one time when that had occurred and, you know, just couldn't - would have been reason to meet with the probation officer more than once, if that second version was correct. So, I think the gentleman simply was not credible; he was deceptive or – you know, getting mixed up on his own. So, in any case, I could understand why the district attorney would have wanted to get rid of him for cause, anyway – just a reason to do it. The gentleman was simply not credible. . . . He gave two very different reasons, and, so, hearing that, my view is that the district attorney had the absolute right to challenge him for cause.

17  (RT 416-18.)

18  Based upon Juror T.'s demonstrated lack of candor, there was ample reason to excuse Juror
19  T. from the panel. Defense counsel simply failed to make a *prima facie* case. Thus, the state court
20  rejection of this claim was not contrary to, or an unreasonable application of, clearly established
21  Federal law. See 28 U.S.C. § 2254(d). The claim should be denied.

22  **B.  Ground Two**

23  In his second claim, Petitioner alleges the doctrine of "natural and probable consequences"
24  could not be used to supply the missing element of intent for first degree murder and the drive-by
25  special circumstance. Petitioner argues the doctrine should have been limited in application to
26  second degree murder. He claims the instruction, CALJIC No. 3.02, denied him his right to have the
27  jury determine whether he harbored the requisite mental states for first degree murder and attempted
28  murder.

1. Background

As previously stated, Petitioner was found guilty as an aider and abettor of one count of first-degree murder with drive-by special circumstances and two counts of attempted murder. The jury was instructed with CALJIC No. 3.02 (1997 Revision), as follows:

> One who aids and abets another in the commission of a crime or crimes is not only guilty of those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted.
> In order to find the defendant guilty of the crimes of, murder and attempted, as charged in Counts 1, 2, 3, and 4, you must be satisfied beyond a reasonable doubt that:
> 1. The crime or crimes of permitting shooting from vehicle, shooting from vehicle at person or shooting from vehicle was or were committed;
> 2. That the defendant aided and abetted the commission of that or those crimes;
> 3. That a co-principal in that or those crimes committed the crimes of murder and attempted murder; and
> 4. The crimes of first degree or second degree murder, and attempted murder, were a natural and probable consequence of the commission of the crimes of shooting from vehicle at person, permitting shooting from vehicle, or shooting from vehicle.
>
> You may not find the defendant guilty as an aider and abettor unless a reasonable person under like circumstances would have recognized that the crime charged was a natural and probable consequence of the act aided and abetted.
> You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crimes of first degree or second degree murder, and attempted murder, were a natural and probable consequence of the commission of that or those target crime or crimes.

($CT^5$ 409, 411.)

2. Clearly Established Supreme Court Law

As a preliminary matter, the court notes that an allegation that a jury instruction is incorrect under state law does not form a basis for federal habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 67, 112 S.Ct. 475 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law."). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Id. at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The court must evaluate jury instructions in the context of the overall charge to the jury

---

[5]"CT" refers to the Clerk's Transcript lodged with the Court.

as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982), *citing* Henderson v. Kibbe, 431 U.S. 145, 154 (1977). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Id.

### 3. Review by State Courts

This claim was also first presented on direct appeal to the 5th DCA, which denied it on February 6, 2002, in a reasoned opinion. See Exhibit 3, Answer. The claim was then presented to the California Supreme Court in a petition for review, which was summarily denied on May 1, 2002. See Exhibit 5, Answer. The California Supreme Court, by its "silent order" denying review of the 5th DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the 5th DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the 5th DCA found the instructions were correct under California law. Citing to People v. Prettyman, 14 Cal.4th 248, 259-60 (1996), the appellate court stated that accomplice liability "turns not only on these principles of aiding and abetting, but on the application of the 'natural and probable consequences' doctrine as well." See Exhibit 3, Answer. The appellate court explained the natural and probable consequences doctrine as follows:

> . . . '[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets . . . It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which . . . must be found by the jury.' [Citation.] Thus, . . . a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any

> other crime that is the 'natural and probable consequence' of the target crime.
> . . . Therefore, when a particular aiding and abetting case triggers application of the 'natural and probable consequences' doctrine, . . . the trier of fact must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime. But the trier of fact must also find that (4) the defendant's confederate committed an offense *other than* the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted. People v. Prettyman, 14 Cal.4th 248, 261-62 (1996).

See Exhibit 3, Answer.

The appellate court found it was not necessary to prove Petitioner intended to kill the three victims in order to convict Petitioner as an aider and abettor. Under California law, "a defendant guilty as an aider and abettor under the 'natural and probable consequences' doctrine need not share the perpetrator's intent to kill." People v. Williams, 16 Cal.4th 635, 691 (1997). The aider and abettor "shares" the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. People v. Beeman, 35 Cal.3d 547, 560 (1984). Furthermore, it was not necessary "to prove [Petitioner] possessed the state of mind required to elevate the murder from second to first degree." Prettyman, 14 Cal.4th at 261. The appellate court concluded:

> "[We] believe the jury reasonably could have concluded under the circumstances that Vargas intended to kill the men from the time he set out with [Petitioner] to find them; that [Petitioner] was aware of Vargas's murderous intentions; and that [Petitioner] knowingly and intentionally assisted Vargas to carry out his plan. In other words, the evidence supports the conclusion that [Petitioner] not only aided and abetted a drive-by shooting, but that he aided and abetted murder and attempted murder. And from this the jury could have inferred that [Petitioner] shared Vargas's intent to kill the three men.

See Exhibit 3, Answer.

The appellate court found no error under California law with the trial court's instructions to the jury.

### 4. Analysis

The Court finds this claim to be without merit. As argued by Respondent, the instant claim does not allege a violation of the Constitution or federal law. The claim is entirely based on interpretation of state law, and generally, issues of state law are not cognizable on federal habeas.

Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas").

Moreover, the appellate court ruled that the instructions used in this case were entirely correct under state law. Federal courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989). State courts are "the ultimate expositors of state law," and this court is "bound by the state's construction except when it appears that its interpretation is an obvious subterfuge to evade the consideration of a federal issue." Peltier v. Wright, 15 F.3d 860, 862 (1994), *quoting* Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (construing state court judgment). See also Melugin v. Hames, 38 F.3d 1478, 1482 (9th Cir.1994) (construing state criminal statute). There is no evidence of subterfuge here. However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir.1981), *citing* Quigg v. Crist, 616 F.2d 1107 (9th Cir.1980); see also Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941); Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir.1999). In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice." Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962).

Here, Petitioner has failed to demonstrate a due process violation. As explained by the state appellate court, the record reflects that Petitioner drove Vargas around the neighborhood to find the three men who had assaulted Vargas. Petitioner supplied Vargas with a gun he knew was loaded. He placed the gun behind the front seats in a place accessible by Vargas, instead of in the trunk where he customarily carried it. After Petitioner and Vargas located the three men, he circled the car around the block and approached the men from the front. He turned on his high beams and drove up to the men slowly. Vargas then shot nine times at the men. Petitioner stopped the car while Vargas shot

once more. Later, Petitioner told a friend that Vargas had been very upset and wanted to shoot them rather than fight them. Given these circumstances, Petitioner's conviction of aiding and abetting first degree murder with a drive-by special circumstance does not constitute a complete miscarriage of justice.

### 5. Conclusion

Petitioner has failed to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or a decision that was based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d). This claim should be denied.

### RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED and the Clerk of Court be DIRECTED to enter judgment.

These Findings and Recommendations are submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    February 27, 2006**            /s/ Lawrence J. O'Neill
b9ed48                                     UNITED STATES MAGISTRATE JUDGE